UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
DIVISION

| | |
|---|---|
| **JOSHELLE SIMS**, | Court File No. |
| Plaintiff, | |
| vs. | |
| **CITY OF MINNEAPOLIS, MINNEAPOLIS POLICE OFFICER DANYELLE DE ROSE, MINNEAPOLIS POLICE OFFICER CHERI PETERSEN, MINNEAPOLIS POLICE OFFICER MICHAEL PRIMOZICH, MINNEAPOLIS POLICE OFFICER MICHAEL DORAN, MINNEAPOLIS POLICE OFFICER ANN MARTIN, MINNEAPOLIS POLICE OFFICER SEARGANT ANN KJOS, MINNEAPOLIS POLICE OFFICER SEARGANT LUIS PORRAS, AND MINNEAPOLIS POLICE OFFICER SEARGANT HOLLY KEEGEL** (all Minneapolis Police Officers are sued in their individual and official capacity), **MINNEAPOLIS PARK POLICE OFFICER ROBERT MOONEY** (in his individual capacity), | **COMPLAINT**<br><br>**JURY TRIAL REQUESTED** |
| Defendants. | |

Plaintiff, by her attorney, The Law Firm of Stephen L. Smith, PLLC, brings this action

seeking relief from defendants' unlawful practices, stating the following as her claims against

defendants.

## JURISDICTION AND VENUE

1.    This Court has original jurisdiction to hear this complaint and to adjudicate the claims stated herein under the Civil Rights Act of 1871, Title 42, §1983 to redress and enjoin the illegal practices alleged in this Complaint.  This Court also has supplemental jurisdiction over plaintiff's state law claim pursuant to Title 28, United States Code, §1367.

2.    Venue is proper in the District of Minnesota because Defendant City of Minneapolis is located in this district, the other individually named defendants are employed in this district, and the incidents in question occurred in this district.

## PARTIES

3.    Plaintiff Joshelle Sims ("Sims") is an African-American citizen of the United States, and at all times relevant hereto was a resident of Hennepin County, Minnesota.

4.    Defendant City of Minneapolis ("City") is a municipal corporation within Hennepin County, Minnesota.

5.    Defendant Robert Mooney ("Mooney") was a police officer with the Minneapolis Park Police Department at all times relevant to this matter.

6.    Defendant Danyelle De Rose ("De Rose") was a police officer with the Minneapolis Police Department at all times relevant to this matter.

7.    Defendant Cheri Petersen ("Petersen") was a police officer with the Minneapolis Police Department at all times relevant to this matter.

8.    Defendant Michael Primozich ("Primozich") was a police officer with the Minneapolis Police Department at all times relevant to this matter.

9.    Defendant Michael Doran ("Doran") was a police officer with the Minneapolis Police Department at all times relevant to this matter.

2

10. Defendant Ann Martin ("Martin") was a police officer with the Minneapolis Police Department at all times relevant to this matter.

11. Defendant Holly Keegel ("Keegel") was a Sergeant with the Minneapolis Police Department at all times relevant to this matter.

12. Defendant Ann Kjos ("Kjos") was a Sergeant with the Minneapolis Police Department at all times relevant to this matter.

13. Defendant Luis Porras ("Porras") was a Sergeant with the Minneapolis Police Department at all times relevant to this matter.

## FACTUAL ALLEGATIONS

14. On November 30, 2011, Kevin Alston ("Alston") was shot and seriously injured as he left a retail store on W Broadway and Lyndale Avenue North at approximately 3:00 p.m. Sergeants Ann Kjos ("Kjos") and Luis Porras ("Porras") investigated this case. They reviewed store surveillance tapes as part of their investigation. According to Kjos, the tapes showed two woman walking into the store as Alston was paying for his merchandise. The woman in front of the other was talking on her phone as they entered the store. Kjos relays that the woman on the phone looked down the aisle in Alston's direction and immediately ended her call, and both women left the store. She says Alston left the store within a minute and was shot just outside the door.

15. The investigators learned the identity of the person suspected of shooting Alston. They also obtained records for his cell phone and learned that he was at or near the location of the retail store where the shooting occurred. They learned as well that the suspect was on his phone moments before Alston was shot.

16.     The police department issued a press release requesting the public's assistance in identifying the women in the store surveillance tape.  The video images were broadcast on television.  Soon thereafter, Sims' family members and friends called her about seeing her on television.

17.     Sims contacted Kjos after learning about her broadcasted image and that police wanted to talk with her about the shooting.  She offered to meet with Kjos the same day, but Kjos was unavailable.  They arranged to meet on another date.

18.     A day or two after she agreed to meet with Kjos, Sims had a disturbing encounter with a strange man in a nearby grocery store.  Apparently, this person had seen her likeness on television in connection with the police department's press release.  He asked Sims what she knew about the shooting.  Sims was taken aback by this person, as she did not know him.  She feared that he could have been connected with the shooting.

19.     After this encounter, Sims decided not to meet with Kjos as planned because she feared for her safety and that of her family.  She did not want any of them to fall victim to gang or drug-related violence, especially after her encounter with the stranger in the grocery store.  Kjos left several voicemail messages as well as a text message asking Sims to go forward with the meeting.  Kjos reflects in her report that Sims did not respond.

20.     On February 8, 2012, Sergeant Keegel and Officers, Petersen, Martin, Doran, Hicks, Nelson, De Rose and Primozich went to Sims' home in the 3500 block of N. Dupont Ave in Minneapolis.  They had instructions from Kjos and Porras to bring Sims to the station for questioning regarding the Alston shooting.  According to De Rose, Porras informed the officers that Sims was a person of interest in connection with the shooting and that, if she did not come willingly, they had probable cause to arrest her.

4

21.     When the police arrived at Sims' house that morning, her sister-in-law, Devena Davis ("Davis"), answered the door.  When they asked for Sims, Davis questioned why they wanted her.  The officers refused to answer and simply insisted that Davis get Sims and implied that they would get her otherwise.  The officers were standing on the porch at this time. Davis did not give them permission to enter the home, but two of the female officers did so anyway, as Davis went upstairs to wake up Sims.  The others followed.

22.     Sims froze half way down the stairs as she was surprised and anxious seeing all of the officers in her home.  Sims asked why the officers were there.  They told her she had to come with them to answer some questions.  Sims refused to do so until the officer provided more information about why they were in her home.  The officer eventually informed Sims that they wanted to question her about the shooting.  Sims told them that she knew nothing about the shooting other than seeing Alston's body on the ground.  Nevertheless, the officers insisted that she had to go with them.

23.     Davis and Lorenzo Miller ("Miller"), the father of Sims' children, were present during this exchange.  Miller and Davis told the officers that Sims had a choice about whether she wanted to go with them.  Miller stated that the officers needed a warrant and he told them they needed to leave his house.  At least one of the officers told Miller to "shut the fuck up or [he] was going to jail."  The residents then questioned the officer's statement.  Again, pointing out that they had no warrant.  Yet another officer told the residents to "shut the fuck up."

24.     Sims told the officers that she was concerned about media attention and that she did not want to place her family in harm's way.  She then invited the officers to conduct their interview at her home.  Two of the male officers dismissed her concerns and stated, "Get your shit; we don't have the whole damn day!"

5

25.     At some point, Davis commented that there was no need for the officers' disrespectful language.  One or more of the officers responded by telling Davis to "shut the fuck up" since she had nothing to do with the situation.  The situation continued to escalate.  Sims responded by telling the officers that they were being very rude and that since they were not serving and protecting they should "give their damn badges up."  One of the female officers responded with "Pugh, look who's fucking talking."  The dialogue continued to deteriorate.

26.     Sims eventually offered to drive herself to City Hall to meet with investigators.  One of the male officers told her no, in no uncertain terms.  But one of the female officers told her she could if she had a license.  At that point, Sims attempted to walk past the officers to retrieve her keys and license from her upstairs bedroom.  One of the officers then attempted to restrain her.  As Sims yelled that the officers had the wrong person and that they were "putting innocent people in jail," one of the other male officers instructed the officer restraining Sims to allow her to pass but to keep an eye on her.  Martin and De Rose followed her upstairs and kept her in sight, even to the extent of forcing her to keep the restroom door opened as she used the bathroom.

27.     Sims gathered her coat, her keys and other personal belongings, and the officers ushered her down the stairs as her two-year old baby lie crying in her bedroom.  Miller followed closely behind.  He remarked that the officers were treating Sims like a suspect instead of a witness and asked the officers for their names and badge numbers.  Officers downstairs responded with "who the fuck are you, do you stay here?"

28.     The officers eventually pat searched Sims, tapping her pockets and taking her keys and cell phone from her.  As they did this, Sims could hear her child crying upstairs.  Davis started to go to the child but a male and female officer blocked her path.  When Davis heard the

baby stumble on the top steps, she moved past the officers to get to her.  One of the officers

searching Sims was holding her by her hair while another officer was holding up her arms.  Sims

had attempted to move away from the officers, asserting that they were not going to disrespect

her in her own home.  They had responded by surrounding her and pushing her against a wall.

Davis and Miller protested, telling the officers that they could not treat Sims that way.  A male

officer on the porch told them to shut up or he would do them the same way.

29.     The officers continued to intimidate the residents of the home.  At one point, they

gave Sims an ultimatum.  They told her she was going to go with them either by choice or by

force.  When she asked what the officers meant by their statement, an officer responded that they

would "pull her out this motherfucker." They also threatened to arrest Miller and Davis if they

came out of the house or looked out of the window when they left with Sims.

30.     The officers forcibly removed Sims from her home.  As they held her by her neck and

forced her down the stairs in front of the house, Sims pleaded with the officers to allow her to

walk under her own control.  The officers eventually handcuffed Sims and placed her in the back

of defendant Mooney's Park Police Squad car.  Mooney had responded to the scene after the

officers requested a marked squad car with a cage to transport Sims to Room 108 in City Hall.

31.     As Sims attempted to exit the squad at City Hall, Mooney slammed the car door on

her legs, which caused significant pain.  She reacted by kicking the door back open.  Mooney

and Martin escorted Sims to the elevator.  As they waited to take Sims to the first floor, she and

the officers continued to exchange "niceties." At one point, Mooney slammed Sims into the wall,

and then took her down to the ground.  He placed his hand on her head and pressed his weight

against her head on the floor.  This caused Sims' earring to press painfully into the side of her

neck.  She screamed that Mooney was hurting her and initially attempted move her head to

relieve the pain.  Mooney pressed harder.  Sims continued to struggle; however, until she was able to move her head enough to bite Mooney's little finger on his gloved hand.  The bite did not break the skin but Mooney did stop pressing her head into the floor.

32.     The county charged Sims with fourth degree assault for biting Mooney.  Sims brought a motion to suppress any evidence of the assault because it was the fruit of an unlawful arrest. Hennepin County District Court Judge Mark Wernick denied the motion to suppress, but he gave the state a deadline to produce evidence that it had probable cause to arrest Sims.  Judge Wernick dismissed the case after the state failed to produce evidence showing it did indeed have probable cause to arrest Sims.

33.     Sims sustained physical injuries as a result of her encounter with Mooney.  She was bruised and sore for several days after this incident.  In fact, she remained bed-ridden for about five days while Davis took care of her children.  She also is in therapy as a result of defendants' conduct, which exacerbated her prior mental health issues.

## COUNT I

**UNREASONABLE SEARCH AND SEIZURE IN VIOLATION OF THE FOURTH AMENDMENT AND THE CIVIL RIGHTS ACT OF 1871, Title 42 United States Code, §1983**

34.    Sims restates and realleges the foregoing paragraphs as though set forth here in full.

35.    The conduct described above will establish that defendants De Rose, Martin, Keegel, Petersen, Primozich, and Doran had no probable cause to enter Sims home or to arrest her.

36.    The conduct described above will establish that the defendant Mooney subjected plaintiff to excessive force.

37.    As a result, defendants, acting under color of state law, deprived Sims of her constitutional right to be free of an unreasonable search and seizure, as guaranteed by the Fourth Amendment.

38.    Sims is entitled to recover all amounts owing under the Civil Rights Act of 1871, 42 United States Code, §1983.

## COUNT II

### FALSE ARREST AND IMPRISONMENT

39.    Sims restates and realleges the foregoing paragraphs as though set forth here in full.

40.    Defendants Kjos, Porras, De Rose, Martin, Keegel, Petersen, Primozich, and Doran caused Sims to be arrested.

41.    These defendants knew there was no probable cause to arrest Sims.

42.    Kjos, Porras, De Rose, Martin, Keegel, Petersen, Primozich, and Doran caused Sims to be restrained and taken to the Minneapolis City Hall to meet with defendants Kjos and Porras.

43.    There was no legally justifiable reason for arresting or detaining Sims.  Defendants' actions constitute false arrest and false imprisonment.

9

44.     Sims sustained injury as a result of the actions of defendants Kjos, Porras, De Rose, Martin, Keegel, Petersen, Primozich, and Doran.  She is entitled to relief.

## COUNT III

## VICARIOUS LIABILITY

45.     Sims restates and realleges the foregoing paragraphs as though set forth here in full.

46.     The City of Minneapolis is liable for its police officers' violation of state common law because they were acting within the scope of their employment when they caused Sims' injuries.

47.     The officers' conduct occurred during working hours while conducting official business.

48.     The officers' illegal conduct during the course and scope of their employment is imputable to the City of Minneapolis as its agents under the vicarious liability doctrine.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff prays for the following:

49.     That the practices of the officers in their individual capacity complained of herein be adjudged in violation of the rights secured by plaintiff under the Fourth Amendment.

50.     That the practices of the officers in their official and individual capacity complained of herein be adjudged in violation of the rights secured by plaintiff under state common law.

51.     That the City of Minneapolis is vicariously liable for its officers' conduct adjudged in violation of state common law.

52.     That a permanent injunction be issued prohibiting the officers from engaging in unreasonable searches and seizures in violation of the Fourth Amendment.

53.     That plaintiff is awarded compensatory damages in an amount to be established at trial.

10

54.     That plaintiff is awarded damages for mental anguish, pain and suffering in an amount to be established at trial.

55.     That plaintiff is awarded punitive damages against the officers in their individual capacity under the Civil Rights Act of 1871, 42 U.S.C. §1983.

56.     That the Court award plaintiff her attorney's fees and the costs and expenses of this action.

57.     That the Court award such other and further relief as the Court may deem just and equitable in the premises.


Dated: October 11, 2013                               *The Law Firm of Stephen L. Smith, PLLC*


                                                      *s/Stephen L. Smith*
                                                      Stephen L. Smith, #190445
                                                      Sellano L. Simmons # 0387026
                                                      700 Lumber Exchange Building
                                                      10 South Fifth Street
                                                      Minneapolis, MN  55402
                                                      Telephone: (612) 305.4355

                                                      ATTORNEYS FOR PLAINTIFF

11